Matter of the Estate of EUGENE WILSON CALDWELL, Deceased.

(Surrogate's Court, New York County, May, 1919.)

**Transfer tax — the good will of the business of a doctor not subject to.**

> Where decedent, a doctor of medicine, who specialized in the taking of X-ray pictures as an aid to physicians, bequeathed the good will of his business, together with the apparatus used in connection therewith, to his two assistants, one of whom was a medical doctor and the other, one who had acquired considerable skill in the business, the profitable conduct of which

by decedent was the result of his superior knowledge and skill, and after his death was not conducted under his name but in that of one of said assistants, there is no good will of the business which is subject to a transfer tax.

APPEAL from an order assessing a transfer tax.

John B. Pine, for executors.

Lafayette B. Gleason (Schuyler C. Carlton, of counsel), for state comptroller.

FOWLER, S. The " decedent " bequeathed the good will of his business, together with the apparatus used in connection therewith, to his two assistants, and the transfer tax appraiser valued the good will at $38,-874.12. The executors contend that the business had no good will which survived the " decedent " and have appealed from the order entered on the appraiser's report.

The decedent was a medical doctor, but he specialized in roentgenology, or the taking of X-ray pictures as an aid to physicians in determining the nature and extent of the disease from which their patients suffered. He was one of the pioneers in the use of X-ray apparatus in the diagnosis of diseases, and invented and perfected many improvements on the mechanical appliances and chemical processes by which such pictures are taken. He acquired great proficiency in the art of taking X-ray pictures; he lectured on the subject before many medical societies and scientific bodies, and became known to the medical profession of this city and the adjacent country as an expert of great knowledge and skill. He appealed for the patronage of the medical profession and not for that of the public generally. Doctors sent their patients to him for the purpose of having X-ray pictures taken of

that part of their anatomy suspected of being the seat of disease. There is no evidence that any persons consulted him or had X-ray pictures taken except those recommended by physicians.

He had two assistants, but no partner. One of these assistants was Dr. Imboden, a medical doctor. The other was not a physician, but he had acquired considerable skill in connection with the taking of X-ray pictures. Dr. Imboden leased the office that had been used and occupied by the decedent, but he removed the decedent's name from the door and substituted his own name.

The question whether the good will of the practice and business of a man who has attained eminence in his profession has, upon his death, a value that is capable of ascertainment or computation, does not seem to have been decided in the reported cases. Lord Eldon's definition of good will (which has been so extensively quoted) does not seem to have much application to a business which is entirely personal and the result of a reputation derived from the possession of superior knowledge. Judge Story's comprehensive definition in his work on Partnership (§ 99) might be considered to include as an element of good will any advantage accruing to the new occupier of premises that had been used by a deceased man of considerable reputation. Judge Vann's definition (*People ex rel. Johnson Co.* v. *Roberts,* 159 N. Y. 83) would seem to require the combination of two elements —" continuing an established business in its old place, and of continuing it under the old style or name." The second element is lacking in the matter under consideration, for the business was conducted under a new name.

The extensive and lucrative business transacted by the decedent was the result of his reputation for great skill in taking X-ray pictures, and as this skill and

knowledge died with him it could not constitute an element of good will that would survive him. The death of a man who had attained such prominence and reputation as a roentgenologist must have received such publicity as would bring it to the attention of practically all the members of the medical profession who knew him by reputation or who would ordinarily have sent patients to him. Therefore, after his death those doctors would not send any more patients to the office theretofore conducted by him; and if the office passed into the possession of another doctor or roentgenologist, it could scarcely be said that its former occupancy by the decedent made it more valuable to his successor. He was succeeded in the office by Dr. Imboden, but the business was conducted under the name of Dr. Imboden, and the name of the decedent was not used in connection with it.

The skill and knowledge which Dr. Imboden acquired during the years of his association with the decedent, and which induced physicians to send their patients to him, were entirely personal to him, and were not transferred to him by the decedent as part of the good will of the business. The reputation which the decedent had acquired was personal to him, and it was not due to the place where he maintained his office or to any trade mark or trade name.

It has been held that a doctor may sell the good will of his business and that the court will recognize the right of the purchaser to such good will (*Hoyt* v. *Holly,* 39 Conn. 326; *Dwight* v. *Hamilton,* 113 Mass. 175; *Townsend* v. *Hurst,* 37 Miss. 679; *Davis* v. *Mason,* 5 T. R. 118; *Mallan* v. *May,* 11 M. & W. 652); but there seems to be a distinction between the business sold by a doctor during his lifetime and the value of that business after his death. If sold during his lifetime, he could introduce the purchaser to his

Surrogate's Court, New York County, May, 1919.    [Vol. 107.

patients and friends as a prudent and reliable physician, and such introduction would immediately give the purchaser a reputation and standing which otherwise might require years to establish. It seems to me that such introduction and recommendation to patients constitute the real consideration for the money paid to a retiring professional man by one who wishes to succeed him. But after a man who has acquired a reputation for great skill or knowledge is dead, persons who would go to his office for the purpose of consulting him and availing themselves of his superior skill would not go there merely because the office was still open and occupied by another person, who had no reputation for superior knowledge or skill. The name of a physician who is prominent in his profession is known to the public generally, although few of them may know where he maintains his office. If any person should require his services they would have no difficulty in obtaining his office address from the directories. It is not, therefore, *where* he practices that is important — it is the reputation which he has attained. But that reputation is necessarily personal to him; it is built upon his personal achievements; it is independent of the location of his office or his assistants. When he dies the fact is usually brought to the attention of the public, and if persons should thereafter require the services of a physician skilled in the particular branch of medicine or surgery with which the deceased physician had been identified, he would not ordinarily go to the office that was maintained by that physician in his lifetime, but would consult some other physician who was regarded as a specialist in the same line of work.

It seems to me that the criterion by which it may be determined whether the business of the decedent had a good will capable of being transferred by his will is:

Misc.] Surrogate's Court, New York County, May, 1919.

If an inconspicuous and unknown physician should take the office which had been occupied by the decedent at the time of his death, and put his own name on the door, would the clients of the decedent, or a considerable number of them, continue to send their patients to that office? In my opinion, it is extremely improbable that such a person would receive any patients from the physicians who patronized the decedent because of his exceptional skill and knowledge. But the evidence in this case shows "that any physician or other person carrying on the profession of making X-ray examinations as a means of medical diagnosis can obtain employment only from physicians who know him personally and have special confidence in his skill and knowledge of such profession." The appraiser's report shows that Dr. Imboden, who was an assistant of the decedent, and who occupied his office after his death, did a reasonably profitable business, but the evidence shows that Dr. Imboden, because of his association with the decedent, had acquired considerable skill in making X-ray examinations, and he became well and favorably known to the physicians who were in the habit of sending patients to the decedent. The special knowledge of roentgenology which Dr. Imboden acquired was probably due, to a considerable extent, to his association with the decedent in the conduct of his business, and the opportunities for becoming acquainted with physicians who usually sent their patients to be X-rayed were also due, in no small measure, to his association with the decedent. But they were both acquired during the lifetime of the decedent, and could not have been transferred to Dr. Imboden by the will of the decedent.

It is not at all improbable that if the members of the medical profession knew that the decedent's laboratory was equipped with superior apparatus, and that

21

Surrogate's Court, New York County, May, 1919.    [Vol. 107.

any person of ordinary proficiency in roentgenology could so manipulate it as to produce superior pictures, the possession of the apparatus might assist in bringing " some of the old customers to the old place." But there is no such proof in the appraiser's report. Then, too, if it was not so much a question of skill in the decedent as excellence in his apparatus, the bequest of the apparatus might include an element of value distinguished from the intrinsic worth of the apparatus itself, and this might be regarded as good will, but there is no such proof in the record before me.

It seems to me, therefore, that as the profitable business conducted by the decedent was the result of his superior knowledge and skill, and that the business was not conducted under his name after his death, there is no good will of the business which is subject to a transfer tax.

The appraiser's report will therefore be remitted to him for the purpose of excluding the good will as an element of value.

Appraiser's report remitted.